UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF JOHN H. SIENKIEWICZ
DECEASED, by Nancy Sienkiewicz,
its Personal Representative,

            Plaintiff,                            Case Number 17-12705

v.                                           Honorable David M. Lawson

CREATIVE TECHNIQUES, INC.,

            Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

John Sienkiewicz filed this action alleging that his employer, defendant Creative Techniques, Inc., breached its contract with him when it withheld his annual bonus in 2017. He filed an amended complaint raising additional claims under the Family and Medical Leave Act (FMLA), and state law claims under Michigan's Sales Representative Commission Act, the Persons with Disabilities Civil Rights Act (PWDCRA), promissory estoppel, and unjust enrichment. Sienkiewicz passed away while the case was pending, and after his personal representative was substituted as the plaintiff. After the federal claim was added, the defendant removed the case to this Court and moved for summary judgment on all counts, arguing that when Sienkiewicz voluntarily terminated his employment with the defendant at the end of 2016, he rendered himself ineligible for his bonus under the subject contract. The plaintiff has raised an issue of fact that precludes summary judgment on the FMLA interference claim, and its resolution also impacts the merits of the breach of contract claim in Count I. But the defendant is entitled to a judgment as a matter of law on all the other state law claims. Therefore, the motion will be granted in part and denied in part.

On May 26, 2002, John H. Sienkiewicz began working as an account manager for the defendant, Creative Techniques, Inc. (CTI), a Michigan corporation that specializes in making custom reusable packaging primarily for the automotive industry. Between 2002 and 2012, Sienkiewicz worked full-time as CTI's exclusive account manager for General Motors. After expressing interest in retirement based on his age, Sienkiewicz transitioned to part-time employment in February 2013. During that time, he retained his same responsibilities and trained CTI employee Rick Micale to take over as the account manager for General Motors. Sienkiewicz remained employed at CTI in this reduced capacity until his retirement on December 31, 2016.

During his tenure at CTI, Sienkiewicz received all salary payments owed to him and was at times eligible for an annual bonus under the defendant's Incentive Sales Compensation Plan (ISCP). Under the ISCP, which has never been subject to any amendments, a salesperson-participant is entitled to a bonus that primarily is calculated as a percentage of net revenue achieved or exceeded by him in a calendar year. Critically, in order to receive payment, a participant must be employed at CTI during the "measurement period" as well as "payment period." The measurement period runs from January 1 through December 31 of the calendar year; the payment period runs from January 1 through March 31 of the following year. Sienkiewicz signed an ISCP agreement and received bonuses under the plan for calendar years 2013, 2014, and 2015. Although eligible and selected for participation, Sienkiewicz did not sign an ISCP agreement for calendar year 2010.

On March 17, 2015, Sienkiewicz was diagnosed with glioblastoma, an aggressive type of brain cancer. He immediately underwent treatment, including a craniotomy, radiation, and

chemotherapy. Sienkiewicz testified that he resumed his part-time work a couple days after his procedures, noting that he did not request any medical leave, nor did CTI offer any. On January 19, 2016, Sienkiewicz signed an ISCP agreement for 2016. He continued to work part-time with no disruptions until his retirement in December 2016.

On August 4, 2016, Sienkiewicz met with CTI's chairman Michael Davis to discuss retirement. Sienkiewicz testified that he expressed concern over his cancer and his old age during that meeting. Davis also remembers Sienkiewicz informing him of a second surgery and requesting that he be able to return to work thereafter. They did not discuss his annual bonus under the ISCP. Davis said that he understood Sienkiewicz's circumstances and that he would be missed.

On December 6, 2016, Sienkiewicz had a second conversation regarding his upcoming retirement, this time with CTI president and general manager Joseph Banfield. During his deposition, Sienkiewicz offered the following summary of their conversation:

Q:     What was the meeting about?

A:     The meeting was about — I had accrued vacation time for 2016. And my boss, whose name was Stan Shore, he retired. And he — we both retired on the same day. And he talked to me, and he says, "Well, you know" —

Q:     I'm sorry. When you say "he" are you referring —

A:     "He" is Stan Shore. He said, "You know, we ought to go out on the same day." he said — "and take our vacation — you know, our accrued vacation." And I said, "Yeah, okay."

And so I talked to Joe Banfield about that, which would take me into January or February of this year. This year, 2017. Anyway, okay. I talked to Joe. I said, "Hey, this is what — this is what Stan was thinking. What are your — he said he talked to you." And he — Joe says, "Nah, I told him it's not a good idea. Just cut it — cut it at the end of the year, and everything will be clean, and that's what you should do."

And that was — that was my discussion with Joe Banfield about retiring.

Sienkiewicz dep. at 31-32, ECF No. 21-4, PageID.868. Banfield remembers things differently. He testified that he never encouraged Sienkiewicz to make a "clean break" with CTI at the end of 2016, nor did he discourage Sienkiewicz from using his vacation days. Banfield stated that they discussed whether Sienkiewicz would receive vacation pay if he were to retire on December 31, 2016, and that he informed Sienkiewicz that he would "check into it." Sienkiewicz testified that they did not discuss his bonus under the ISCP during this meeting.

CTI's Employee Handbook outlines leave time for CTI employees, noting that salaried employees at CTI of Sienkiewicz's tenure are entitled to three weeks of paid vacation per year, which do *not* carry over from year to year. Sienkiewicz averred that he believed he was entitled to around 200 days of vacation at the time of his meeting with Banfield. Although his paystub from that pay period indicates that he had 120 days available, Banfield explained in his deposition that the paystub, and others like it, reflect a clerical error from when CTI changed payroll companies. During their conversation, Banfield assured Sienkiewicz that he would follow up with human resources regarding his vacation time. Banfield testified that instead he spoke directly to Michael Davis, who informed him that Sienkiewicz was not eligible for vacation time. At the time of his retirement, Sienkiewicz had no vacation days left over.

At some point in the Spring of 2017, Sienkiewicz realized that he did not receive his bonus under the ISCP for 2016. On March 18, 2017, he met with Davis at their "bagel spot" to find out what happened to his bonus as well as to suggest that his trainee, Rick Micale, receive 60% of his bonus. Sienkiewicz testified that Davis merely told him that he was "working on it" and would be in touch; Davis never followed up. Davis testified that he never made any such assurances and that they primarily discussed Sienkiewicz's health.

-4-

On April 6, 2017, Sienkiewicz sent Davis and Banfield the following email, titled "Oh my. What a surprise!":

> To:    Mike Davis
>        Joe Banfield
>
> For the last six weeks, I waited for the mail to deliver my last bonus check. When April arrived without any check, I realized there was a problem. Consequently, I thoroughly read the last bonus contract agreement. Imagine my surprise when I discovered the clause, ". . . must be employed for both measurement period and payment period."
>
> So what if:
>
> 1. Mike, during my exit interview in December, you would have reminded me that I would become ineligible to receive my 2016 bonus if not employed during the payment period?
>
> 2. Joe, during our "mono a mono" meeting, you would have recommended that I stay until the end of the first quarter to be eligible for the 2016 bonus, instead of encouraging me to leave without using remaining vacation days, as I was contemplating?
>
> Although I realize we are responsible for our own decisions, I feel let down by those for whom I have worked so diligently for the last fifteen years.
>
> Your retired but stbill [sic] loyal employee,
>
> John Sienkiewicz

Apr. 6, 2017 Email, ECF No. 21-10, PageID.952. Davis and Banfield never responded to Sienkiewicz's email.

Sienkiewicz testified that he believed his bonus for 2016 would have been at least $142,500. Rick Micale apparently represented to Davis in February 2017 that Micale carried 100% of the workload shared between him and Sienkiewicz for calendar year 2016. Davis testified that Micale received a bonus in March 2017 that represented the full amount of what would have been owed to Sienkiewicz.

On at least one prior occasion, the defendant issued a bonus under the ISCP to a terminated salesperson — Stewart Wilson — who was not employed through the relevant payment period.

Based on these facts, the plaintiff's amended complaint pleads claims on the theories of breach of contract (Counts I and II); violation of Michigan PWDCRA (Count III); violation of Michigan Sales Representative Commission Act (Count IV); violation of the FMLA (Count V), unjust enrichment (Count VI), and promissory estoppel (Count VII).

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

A.

The defendant argues that the breach of contract claims in Count I of the amended complaint must be dismissed because paragraph 4 of the ISCP prescribes unambiguous eligibility requirements that include employment during the payment period, which Sienkiewicz plainly did not meet for the 2016 bonus. Count II is based on the employee handbook's vacation pay provisions, which the defendant says is not a contract to begin with. The plaintiff does not deny

that the documents say what they say, but she insists that paragraph 4 of the ISCP is procedurally and substantively unconscionable and must be severed from the rest of the agreement. She also argues that paragraph 4 is an unenforceable condition precedent, which the defendant waived when it interfered with Sienkiewicz's effort to use his accrued vacation days and his FMLA leave entitlement to extend his employment into the payment period. She also argues, without much support, that the provision is not supported by adequate consideration as the promise to pay the bonus is illusory.

1.

The core of the plaintiff's claims is based on a breach of contract theory. The parties agree on the basic rules. To prevail, the plaintiff must offer evidence establishing that (1) there was a contract, (2) the defendant breached it, and (3) the plaintiff suffered damages as a result. *AFT Michigan v. Michigan*, 303 Mich. App. 651, 660, 846 N.W.2d 583, 590 (2014) (quoting *Miller-Davis Co. v. Ahrens Constr., Inc.*, 296 Mich. App. 56, 71, 817 N.W.2d 609 (2012)). When enforcing a contract, the first objective is to "honor the intent of the parties," *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994), and the prime source of that intent is the plain language of the agreement, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language."). If the contract language is "clear and unambiguous," the Court does not look beyond the written words to ascertain its meaning. *Haywood v. Fowler*, 190 Mich. App. 253, 258, 475 N.W.2d 458, 461 (1991). A contract is not ambiguous if it "fairly admits of but one interpretation." *Allstate Ins. Co. v. Goldwater*, 163 Mich. App. 646, 648-49, 415 N.W.2d 2, 4 (1987).

The plaintiff faces a steep climb to show that paragraph 4's clear and unambiguous continued employment requirement for bonus eligibility is unconscionable. She must demonstrate both procedural and substantive unconscionability. *Vittiglio v. Vittiglio*, 297 Mich. App. 391, 403, 824 N.W.2d 591, 597-98 (2012) (quoting *Hubscher & Son, Inc. v. Storey*, 228 Mich. App. 478, 481, 578 N.W.2d 701 (1998)). The former exists when the weaker party is faced with a take-it-or-leave-it proposition, *Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138, 144, 706 N.W.2d 471, 474 (2005), or where the challenged provision effectively is "buried in the text of the document," *High v. Capital Senior Living Properties 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 799 (E.D. Mich. 2008). The latter occurs when "the inequity of the term is so extreme as to shock the conscience." *Clark*, 268 Mich. App. at 144, 706 N.W.2d 475.

No record fact supports either element. There is no evidence that Sienkiewicz was unable to reject the terms of the agreement — or the entire ISCP for that matter. In fact, he previously rejected the very same provision in 2010, when he declined signing the ISCP for that year. Nor was he denied a meaningful opportunity to negotiate, and he was not rushed into consenting to the forfeiture provision. The plaintiff cites *High v. Capital Senior Living Properties 2-Heatherwood, Inc.* to support her position, but that case does not help her, since "there is no suggestion in the record that the plaintiff was pressured into acquiescing in the" ISCP. *See High*, 594 F. Supp. 2d at 800. Moreover, the forfeiture provision can be found with ease on the first page of the agreement, refuting any claim that Sienkiewicz could not have known all that he agreed to, if he had read what was there.

And there is nothing about the ISPC's requirement of continued employment through both the measurement and payment periods that shocks the conscience. The requirement sensibly aligns

the employer's interest in retaining talented employees and the employee's interest in building on his bonus for the following year. And as the defendant notes, forfeiture provisions like this one have been upheld as enforceable by other courts. *See Bader v. Wells Fargo Home Mortg., Inc.*, 773 F. Supp. 2d 397, 408 (S.D.N.Y. 2011) (recognizing "an employer's requirement that an employee be employed through a certain time period" as a valid condition precedent to an employee's entitlement to a bonus).

The plaintiff also sets forth an underdeveloped argument that the ISCP is illusory. But it is not clear based on the plaintiff's briefing how this argument fits within the unconscionability analysis. The Court concludes that it does not. Because the forfeiture provision is neither procedurally nor substantively unconscionable and is not otherwise subject to traditional contract defenses, it is enforceable as written. *See Liparoto Constr., Inc. v. Gen. Shale Brick, Inc.*, 284 Mich. App. 25, 30, 772 N.W.2d 801, 805 (2009) ("An unambiguous contractual provision . . . is to be enforced as written unless the provision violates the law or public policy or is otherwise unenforceable under traditional contract defenses, including duress, waiver, estoppel, fraud, or unconscionability.").

### 2.

"As written," the plaintiff says, paragraph 4 is a condition precedent, which the defendant cannot enforce because it interfered with Sienkiewicz's effort to satisfy it. There is law to support that theory. A condition precedent "is a fact or event that the parties intend must take place before there is a right to performance." *Harbor Park Market, Inc. v. Gronda*, 277 Mich. App. 126, 131, 743 N.W.2d 585, 588 (2007) (internal quotations and citations omitted). "If the condition is not satisfied, there is no cause of action for a failure to perform the contract." *Id.* at 131 (citing *Berkel*

*& Co. Contractors v. Christman Co.*, 210 Mich. App. 416, 420, 533 N.W.2d 838 (1995)). But promisors "cannot avoid liability on the contract for the failure of a condition precedent where they caused the failure of the condition." *Id.* at 131. "Where a party prevents the occurrence of a condition, the party, in effect, waives the performance of the condition." *Id.* at 132 (citing *Mehling v. Evening News Ass'n*, 374 Mich. 349, 352, 132 N.W.2d 25 (1965)).

Paragraph 4 of the ISCP unquestionably qualifies as a condition precedent to the decedent's entitlement to his bonus.

a.

Michigan case law "generally reflects that a party must prevent the condition from occurring by either taking some affirmative action, or by refusing to take action required under the contract, before a court will find a waiver of a condition precedent." *Harbor Park*, 277 Mich. App. at 132, 743 N.W.2d at 589 (collecting cases). The plaintiff argues that the defendant affirmatively interfered with the decedent's ability to satisfy the condition by denying him accrued vacation time as contemplated by the Employee Handbook. That argument is a nonstarter. Sienkiewicz signed an acknowledgment that the handbook — the source of his "right" to vacation time — did not constitute a contract. The acknowledgment form expressly provides:

> I understand and acknowledge that this handbook incorporates all the terms and conditions of my employment, and *that neither this document nor the handbook itself is a contract* for personal services nor a guarantee of continued employment, nor does any portion here of modify the at-will nature of my employment.

Handbook Receipt, ECF No. 18-11, PageID.711. That sort of language, says the Michigan Supreme Court, evidences an employer's express intent not to be bound to any provision contained in an employee handbook and renders the document unenforceable as a contract. *Heurtebise v. Reliable Bus. Computs.*, 452 Mich. 405, 413, 550 N.W.2d 243, 247 (1996).

Even if the handbook created a binding contract, Sienkiewicz could not have satisfied his employment requirement through the payment period solely based on accrued vacation time. According to section 3.08 of the Employee Handbook, salaried employees who have continuously served for five or more years are entitled to three weeks or 120 hours of paid vacation. But the Handbook requires a "vacation request[s] [to] be made 30 days prior to the vacation." More importantly here, "[e]mployees must take their vacation within the calendar year or forfeit the unused portion thereof." Because this unambiguous "use it or lose it" policy precludes rolling over vacation time into subsequent years, Sienkiewicz was entitled to at most three weeks of vacation in 2016, which could not carry over into the following year. Moreover, the defendant's Chief Financial Officer Robert Nyquist testified that at the time of the decedent's retirement, he had used all his vacation time for calendar year 2016. That fact is undisputed as well.

b.

The plaintiff also contends that the defendant refused to allow Sienkiewicz to use his twelve weeks of leave time to which he was entitled under the FMLA, which would have extended his employment through the payment period in 2017 and satisfied the condition precedent. That contention cannot be resolved as a matter of law on this record.

The FMLA entitles qualifying employees to twelve weeks of unpaid leave each year if an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1); *see also* 29 C.F.R. § 825.220(b) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the

exercise of rights provided by the Act."). Employers who violate section 2615 are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1).

An FMLA interference claim requires proof that the plaintiff (1) was an eligible employee under the FMLA; (2) the employer was a covered employer under the FMLA; (3) he was entitled to FMLA leave; (4) he gave the employer notice of his intention to take FMLA leave; and (5) the employer denied the required FMLA benefits. *Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) (quoting *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577-78 (6th Cir. 2007)).

The parties apparently do not dispute that the plaintiff has satisfied the first three elements. However, the defendant insists that nothing in the record supports the notion that Sienkiewicz requested FMLA leave, or that anything he said or did would have put it on notice that FMLA leave was part of the discussion.

An employee must give his employer prompt notice of an intention to take FMLA leave. 29 C.F.R. § 825.302(a), (b). "An employer has the option of requesting (in writing) that an employee provide medical certification that she is suffering from a serious medical condition," *Wallace v. FedEx Corp.*, 764 F.3d 571, 587-88 (6th Cir. 2014) (citing 29 C.F.R. § 825.305(a)), but there is no question here that Sienkiewicz's brain cancer satisfied that requirement. "An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying." 29 C.F.R. § 825.302(c). Sienkiewicz did not default on this obligation.

It is true that Sienkiewicz did not talk about FLMA leave when he sought to extend his employment into 2017 through another sort of leave, that is, his accrued vacation. But "the eligible employee need not expressly mention the FMLA as the source of his right to request such leave. Rather, the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004) (citations omitted).

The plaintiff points to evidence of a conversation between Sienkiewicz and Joseph Banfield in December 2016 — described by Sienkiewicz in his deposition and quoted in full above —as furnishing the necessary information to the defendant that triggered certain obligations under the FMLA. "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days." 29 C.F.R. § 825.300. The plaintiff contends that this conversation alerted the defendant to Sienkiewicz's need to take leave for a serious health condition, and that the defendant did not respond as the FMLA required. Failure to follow the FMLA notice requirements may constitute an interference with FMLA rights. 29 C.F.R. § 825.300(e).

Although there is no mention of his cancer in that conversation, there is evidence that Sienkiewicz previously met with Michael Davis in August 2016 to discuss his health concerns and the possibility of retirement. The plaintiff argues that because Banfield and Davis unquestionably

knew that Sienkiewicz was terminally ill at the time of the December 6 meeting, his request for vacation days should have put the defendant on notice of his need for FMLA leave.

At oral argument, the defendant cited cases to support the idea that this evidence falls short of the required notice. The Court does not read them that way. In *Woodman v. Miesel Sysco Food Services Company*, 254 Mich. App. 159, 657 N.W.2d 122 (2003), the court affirmed the lower court's finding that the plaintiff provided adequate notice of his need for leave under the FMLA. There, the plaintiff informed the defendant, through its employees, that he would not be returning to work until after he completed a physician-ordered stress test to be administered approximately ten days after he suffered chest pains that caused him to leave work. 254 Mich. App. at 162, 657 N.W.2d at 125. The plaintiff waited approximately ten days to deliver to the defendant the emergency medical room discharge plan that specified "No work until stress test" and listed a brief diagnosis of his symptoms. *Ibid.* The plaintiff was given a stress test approximately four days later and released to work the next day. 254 Mich. App. at 163-64, 657 N.W.2d at 126. The plaintiff, a union member, then learned that he had been terminated a few days earlier for allegedly violating absences-related rules of his collective bargaining agreement. *Ibid.* In finding for the plaintiff on appeal, the court emphasized the employer's burden to "inquire further" if unsure whether an employee's leave qualifies. 254 Mich. App. at 172-74, 657 N.W.2d at 131. The court concluded that in light of "the defendants' awareness of the events leading to plaintiff's emergency room visit," the plaintiff's communications with various employees regarding his upcoming stress test constituted adequate notice. *Ibid.*

In *Cavin v. Honda of America Manufacturing., Inc.*, 346 F.3d 713 (6th Cir. 2003), the Sixth Circuit reversed the district court's finding that the plaintiff did not provide sufficient notice to his

employer of his request to take time off for a serious health condition. There, the plaintiff took several days off work after he injured his shoulder in a motorcycle accident. *Id.* at 716-17. His treating physician wrote him a note excusing him from work for three days, and a second doctor excused him for an additional four days. *Ibid.* The plaintiff testified that he informed his employer that he had been injured in a motorcycle accident, had just got out of the hospital, and was unable to work due to his injury. *Id.* at 725. In rejecting the defendant's argument that the plaintiff failed to provide any information that might lead it to conclude that the plaintiff was experiencing a "serious health condition," the court emphasized that the plaintiff "did not merely state that he was involved in a motorcycle accident, but rather provided additional information about his treatment and condition — he told Honda that he was unable to perform his job because of his injury." *Ibid.* The court of appeals reversed the district court's grant of summary judgment in favor of the defendant on the FMLA claim, noting "[c]learly there is a disputed issue of material fact as to the content of the notice Cavin gave Honda on June 21." *Id.* at 724.

In *Wallace v. FedEx Corporation*, 764 F.3d 571 (6th Cir. 2014), the Sixth Circuit affirmed the magistrate judge's denial of judgment as a matter of law against the defendant on the issue of FMLA liability. There, the plaintiff claimed that the defendant interfered with her FMLA rights after she was terminated for taking extended leave after her originally authorized FMLA leave expired. On appeal, the defendant argued that the plaintiff failed to provide enough documentation for continued leave. *Id.* at 586. In rejecting that argument, the court explained that "[t]he relevant question is whether Wallace provided FedEx with notice that she needed FMLA leave, not whether she provided notice that she needed a certain amount of FMLA leave." *Ibid.* The court noted that the plaintiff provided her employer with a doctor's note, indicating that she had a serious medical

condition that required her to take leave, and that the plaintiff's manager understood she needed to take leave as evidenced by the fact that he provided the plaintiff with FMLA paperwork. *Id.* at 587.

These cases support plaintiff's argument that Sienkiewicz furnished enough information to trigger the defendant's obligation to start a dialogue about the availability of FMLA leave. As in *Woodman*, the defendant's awareness of the plaintiff's circumstances undermines the argument that the defendant could not have known that Sienkiewicz was seeking leave for health-related reasons. And in *Cavin*, the court decided that the dispute over the content of the conversations precluded summary judgment.

The defendant also cited *Donald v. Sybra, Incorporated*, 667 F.3d 757 (6th Cir. 2012), where the Sixth Circuit affirmed the district court's grant of summary judgment in favor of the defendant on the plaintiff's FMLA interference claim. But that case does not shed light on what constitutes substantively-sufficient notice, as the district court addressed only whether the defendant's reasons for terminating the plaintiff were pretextual.

Based on Sienkiewicz's testimony regarding his meetings with the defendant's officers, a jury could reasonably find for the plaintiff on the issue of substantively-sufficient notice. For that reason, a trial is necessary to resolve the questions whether the defendant interfered with Sienkiewicz's FMLA rights (Count V), and whether the defendant waived that condition precedent to the payment of his 2016 bonus under the ISCP (Count I). The breach of contract claim in Count II of the amended complaint, based on the employee handbook's vacation pay provisions, will be dismissed.

The defendant asserts that it could not have violated Michigan's Sales Representative Commission Act (SRCA), Mich. Comp. Laws § 600.2961, as alleged in Count IV of the amended complaint, because the ISCP bonus is not a "commission" as defined under the statute, and even if it were, the SRCA states that a contract between a principal and a sales representative (in this case the ISCP) determines when a commission becomes due. The Court agrees.

The SRCA "was enacted in 1992 to provide special protection to sales representatives, with the Legislature's expressed public policy to provide significant protections for a salesperson to collect his or her commissions." *Linsell v. Applied Handling, Inc.*, 266 Mich. App. 1, 14, 697 N.W.2d 913, 920 (2005). But the statute defines a "commission" as "compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits." Mich. Comp. Laws § 600.2961(1)(a). Michigan courts distinguish commissions from bonus plans that allow for incentive pay after a certain quota is met. *See Anusbigian v. Trugreen/Chemlaw, Inc.*, 72 F.3d 1253, 1254 (6th Cir. 1996) (citing *Gravely v. Pfizer, Inc.*, 170 Mich. App. 262, 267, 427 N.W.2d 613 (1988).

Under the ISCP, annual bonuses — the funding for which is calculated as a percentage of net revenue once a minimal threshold level has been met — are distributed to participant salespersons as follows:

> a. 30% Team Component. This portion shall be distributed equally to each eligible salesperson.
>
> b. 50% Individual Component. This part of the Plan shall be distributed only to those salespeople who exceed their individual net revenue target and/or absolute net revenue in excess of the average net revenue target per salesperson, presented in the Monthly Sales Report. One-half (50%) of the individual component of the

Plan will be paid based upon the percentage that a salesperson exceeds their respective individual net revenue target, divided by the sum of the percentage that all other salespeople, if any, exceed their individual net revenue targets. The remaining one-half (50%) of the individual component of the Plan will be paid based upon the percentage that a salesperson exceeds the average net revenue target per salesperson, divided by the sum of the percentage that all other salespeople, if any, exceed the average net revenue target per salesperson.

c. 20% Discretionary Component. Management will determine the equitable distribution of this component based upon a variety of factors that impact the success of the organization.

2106 Incentive Plan at 5, ECF No. 18-5, PageID.639.

The ISCP plainly establishes that the decedent "was not entitled to commissions on sales made until the sales . . . exceeded a set quota." *Anusbigian*, 72 F.3d at 1254. "Such an arrangement constitutes a 'bonus' plan, not commissions." *Ibid.* (citing *Gravely*, 170 Mich. App. at 267, 427 N.W.2d at 615 (1988)). Even if the unpaid bonus here could be considered a commission within the meaning of the SRCA, "[t]he terms of the contract between [CTI] and [the decedent] shall determine when a commission becomes due." Mich. Comp. Laws § 600.2961(2). The ISCP expressly notes that "[a]nnual bonuses related to the Plan will be paid in the first quarter of the following year." The plaintiff has no right to relief under the SRCA.

## C.

As an alternative to its breach of contract claims, in Counts VI and VII the plaintiff asserts the quasi-contractual theories of promissory estoppel and unjust enrichment as grounds for equitable relief. These claims cannot proceed because a valid contract governs the relationship between the parties.

A promissory estoppel claim is premised on the existence of a promise that the promisor reasonably should have expected to — and did— induce detrimental reliance by the promisee, where the failure to enforce the promise would cause an injustice. *Zaremba Equipment, Inc. v.*

-19-

*Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 41, 761 N.W.2d 151, 166 (2008) (citing *Booker v. Detroit*, 251 Mich. App. 167, 174, 650 N.W.2d 680 (2002), *rev'd in part on other grounds*, 469 Mich. 892, 668 N.W.2d 623 (2003)). However, "no action for promissory estoppel may lie when an oral promise expressly contradicts the language of a binding contract." *Ibid.* (citing *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 687, 599 N.W.2d 546 (1999)).

Here, the plaintiff advances two arguments to support her claim of promissory estoppel; neither persuades. First, the plaintiff argues that if the Court finds the ISCP unenforceable based on unconscionability, then the plaintiff can show that the decedent reasonably relied on a representation that he would receive his incentive compensation. But, as noted above, the ISCP is not unconscionable, so that argument cannot take root. Second, the plaintiff argues that if the Employee Handbook is found not to be a binding contract, then Sienkiewicz reasonably relied on his entitlement to accrued vacation days to be applied toward his employment time under the ISCP. However, the amended complaint pleads a claim of promissory estoppel based on compensation owed under the ISCP only. There are no allegations concerning a promise to allow Sienkiewicz certain vacation days to be applied toward his employment requirement. And in any event, the Employee Handbook does not even imply that the vacations days would carry over year to year.

The plaintiff's claim of unjust enrichment similarly dies aborning. "The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." *Bellevue Ventures, Inc. v. Morang-Kelly Inv., Inc.*, 302 Mich. App. 59, 64, 836 N.W.2d 898, 901 (2013) (citing *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546, 473 N.W.2d 652 (1991)). "In such instances, the law operates to imply a contract in order to prevent unjust enrichment." *Ibid.* (citing *Martin v. East*

*Lansing Sch. Dist.*, 193 Mich. App. 166, 177, 483 N.W.2d 656 (1992)).  Once again, though, "a contract will be implied only if there is no express contract covering the same subject matter." *Ibid.*  The ISCP plainly constitutes an express contract governing the decedent's entitlement to his bonus.  Therefore, the plaintiff's claim of unjust enrichment is foreclosed as a matter of law.

D.

In Count III, the plaintiff alleges that the defendant violated the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101, *et seq.*, by denying Sienkiewicz his bonus under the ISCP based on a disability and that similarly situated employees were not subject to the same adverse decision.  Under the PWDCRA, "an employer shall not . . . discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position."  Mich. Comp. Laws § 37.1202(b).  That statute "substantially mirrors" the Americans with Disabilities Act (ADA). *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012).  And claims brought under it "essentially track those under the ADA." *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) (quotations and alterations omitted).

The elements of a PWDCRA claim are that the plaintiff (1) was disabled as defined by the Act; (2) the disability was unrelated to his ability to perform his job duties; and (3) that he has been discriminated against in one of the ways outlined in the Act.  *Peden v. Detroit*, 470 Mich. 195, 204, 680 N.W.2d 857 (2004).  The Court assesses the viability of such claims using the *McDonnell Douglas* burden-shifting analysis. *Demyanovich*, 747 F.3d at 433. Under the *McDonnel Douglas* structure, "the employee has the initial burden of establishing [her] *prima facie*

case; if [s]he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Id.* at 427.

The parties do not dwell on the first two parts of the *McDonnell Douglas* analysis, but instead concentrate their argument on whether the defendant's reason for not awarding Sienkiewicz his bonus — that he was not employed through the payment period — is pretextual. The plaintiff argues that the defendant required strict compliance with the payment period requirement from Sienkiewicz only. The plaintiff points to Michael Davis's testimony that the defendant distributed bonus paychecks for 2016 before the conclusion of the payment period in 2017, contending that amounts to arbitrary noncompliance. The plaintiff also notes that prior to his death, Sienkiewicz testified that he had been told that another employee received a bonus under the ISCP even though he was terminated before the conclusion of the payment period. Acknowledging that he "only kn[e]w of hearsay on this kind of stuff," Sienkiewicz testified that a salesperson by the name of "Stuart" had received his bonus under the ISCP despite being laid off for poor performance.

The defendant says, without contradiction, that the employee Sienkiewicz referenced was Stewart Wilson who was fired in 2012 for poor performance and signed a release and settlement agreement, which obligated the defendant to pay his discretionary incentive compensation under the 2011 ISCP. The defendant convincingly maintains that Sienkiewicz is not comparable for the purpose of establishing pretext. Wilson was paid his bonus even though he was not eligible under the ISCP in consideration for settling a claim after he was fired. Sienkiewicz was not fired; he retired voluntarily for personal reasons. The plaintiff has not put forth any evidence to suggest

that Sienkiewicz's health — rather than his failure to satisfy the ISCP's requirements — was the real reason why he was not awarded a bonus.

The plaintiff has not produced sufficient evidence on all the elements of her PWDCRA claim, and the defendant is entitled to a dismissal as a matter of law.

III.

Fact questions prevent summary judgment on Counts I and V of the amended complaint, but the plaintiff has not brought forth evidence that creates a material fact question on the elements of the claims for breach of contract based on the Employee Handbook, promissory estoppel, unjust enrichment, of violation of the Persons with Disabilities Civil Rights Act.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 18) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts II, III, IV, VI, and VII of the amended complaint are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: October 18, 2018

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on October 18, 2018.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI

---